IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO.: 3:24-cv-648-FDW-SCR

David Locklear,

    Plaintiff,

v.

Darling Ingredients, Inc.,

    Defendant.

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

## I. INTRODUCTION

1. It cannot be said that Plaintiff, David Locklear ("Plaintiff" or "David") lacked commitment or loyalty for Darling Ingredients, Inc. ("Defendant"), and its predecessor. Over the course of nearly two decades, David was an exemplary employee doing everything asked of him and then some. For most of his career, Defendant seemed to appreciate his effort and work; David was regularly given pay increases and merit bonuses for his stellar work and leadership. After so many years of service to Defendant, David envisioned a future where he would continue to rise through the ranks and ultimately retire as an employee.

2. Rightfully so, David is proud of himself, his work ethic, reputation, family and his Native American heritage as a member of the Pee Dee Indian tribe. However, after Darling Ingredients purchased Valley Proteins, it became apparent that David's Native American heritage became an impediment to a continued career under the new leadership. In 2021, a golden opportunity presented itself for advancement; the Wadesboro Facility (the "Facility"), where David worked as a Maintenance Manager, had a General Manager vacancy. By that point, David had approximately 15 years of management experience and knew the Facility like the back of his

hand. The only other known candidate for the role was Mike Craumer (white), a Project Manager at the Ward, South Carolina Division. On paper, David had Mr. Craumer beat on any conceivable objective criteria, not the least of which was the intellectual capital of working at the Facility for decades. Nevertheless, Mr. Craumer was promoted to the role. The cause of the promotion denial became apparent when David overheard a senior leader describe him as "some kind of fucking Indian."

3. Later, when an employee suffered a workplace accident, David was scapegoated and ultimately terminated for an issue that he had previously tried to report to Mr. Craumer and told to "back off." In truth, the accident was not David's responsibility. White employees who were arguably more, or at least equally, culpable kept their jobs. Defendant has refused every olive branch to amicably resolve the matter, thereby necessitating the filing of this Lawsuit consisting of four counts: (i) Section 1981 for failure to promote and wrongful termination (ii) Title VII of the Civil Rights Act of 1964 for wrongful discharge; (iii) wrongful discharge in violation of North Carolina Public Policy, and (iv) North Carolina Retaliatory Employment Discrimination (REDA).

## II. PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is a resident of Richmond County, North Carolina.

2. Plaintiff, at all relevant times, worked for Defendant at its 656 Little Duncan Rd. location in Wadesboro, North Carolina.

3. Defendant was, at all relevant times, a Delaware Corporation doing business in the State of North Carolina in Anson County.

4. Defendant's registered place of business was at all relevant times, 160 Mine Lake Ct., Ste. 200, Raleigh, North Carolina.

5. Plaintiff seeks damages in a sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. §§ 7A-243 *et seq*.

6. Venue is proper in this Court pursuant to N.C. Gen. Stat. § 1-82.

### III. FACTUAL STATEMENT

7. David was hired by Valley Proteins, Inc. ("Valley Proteins") as a Plant Maintenance Manager for its Wadesboro facility on May 22, 2003. In or around May of 2022, Defendant completed its acquisition of Valley Proteins, at which time David became an employee of Defendant.

8. David's job responsibilities included all daily plant mechanical operations including:

(a) Managing approximately 23 employees spread over day and night 12-hour shifts, including two Maintenance Supervisors, electricians, boiler technicians, welder/fabricators, and general mechanics.

(b) Overseeing the maintenance of all mechanical issues in the entire facility, which encompassed four different buildings spread out over a 40-acre property.

(c) Preventive maintenance and response to production related breakdowns for all aspects of machinery function and reliability;

(d) Coordinating all outside contract work and in-house projects;

(e) Scheduling all preventive maintenance updates;

(f) Managing a multi-million-dollar annual budget for maintenance;

(g) Care and maintenance of all aspects of boiler room and high-pressure steam delivery;

(h) Testing chemistry for the boiler water;

(i) Planning and scheduling plant-wide downtime;

    (j) Responding to onsite breakdowns around the clock; and

    (k) Being on call 24/7.

  9. Throughout his almost 20-year tenure with Defendant, David maintained an exemplary employment record. He responded to all on-site mechanical emergencies and serious mechanical breakdowns no matter when they occurred or how long they took, and he worked numerous 70-80-hour weeks on salary pay without any overtime or additional benefits. David excelled in his position as evidenced by regular raises and bonuses, including a 2% safety bonus that increased his salary to $95,000 in 2020 and a $17,000 merit increase in 2021.

  10. In early 2022, David applied for the position of Wadesboro Facility General Manager which had recently become vacant. At the time of his application, David was the most experienced manager in the division and had more knowledge and experience then the last three General Managers. Prior to submitting his resume for the position, David asked prior General Managers and District Managers about his chances of being promoted to General Manager based on his experience and qualifications. They all informed him that his resume is exactly what they would want to see in a General Manager candidate. Additionally, at that point in time, David was the only in-house person with the requisite level of experience to fulfill the General Manager position. Indeed, several employees at the Wadesboro facility expressed to David that they thought he would be the next General Manager, based on his level of experience.

  11. The only other candidate for the General Manager position was a white employee, Mike Craumer, who was the Project Manager for the Ward, South Carolina Division. As a Project Manager, Mr. Craumer was lower on the management hierarchy than David. However, Mr. Craumer had a family connection that appeared to benefit him, his brother-in-law, who was the Plant Maintenance Manager at the Fayetteville, North Carolina division. In addition to being

4

higher on the management hierarchy, David was also substantially more qualified for the position than Mr. Craumer:

    (a) David had 15 years of management experience;

    (b) David knew the Wadesboro facility inside and out and knew every operation, machine, employee, and the official and unofficial policies;

    (c) David had ample prior experience in rendering; and

    (d) David had undergone all the necessary training for the types of operations the Wadesboro facility required.

12. In contrast, Mr. Craumer had less than five (5) years of experience as a plant manager and no familiarity with the Wadesboro facility operation and machinery.

13. David cultivated this experience by showing up daily and consistently for nearly two decades day or night. District Managers, who were higher on the organizational chart than General Managers, often called David if they needed guidance on how something should work, but would often take credit for the solution themselves.

14. On January 18, 2022, Director of Plant Operations Tom Gibson (white), informed David he was not selected for the General Manager position. As the manager with hands down the most experience in the division, David did not understand why he was passed over. Additionally, the reason Defendant provided for not promoting David—that he did not have General Manager experience—was clearly pretextual; Mr. Craumer also lacked General Manager experience, but was selected for the position.

15. Around this time, David was also surprised to learn that another white employee, William "Hal" Davis, would be given the District Manager position and would supervise Mr. Craumer. In the times that Mr. Craumer was not present, David would report to Mr. Davis.

16. Nevertheless, David was determined to maintain his track record of success and to help Mr. Craumer succeed in his new position. Unfortunately, David's goal of helping Mr. Craumer succeed proved to be a difficult one; Mr. Craumer was not ready for the General Manager position and David was required to repeatedly step in to perform the General Manager duties, while Mr. Craumer received the General Manager compensation. Mr. Craumer was clueless to basic plant operations, so David had to coach him through downtime events. David also had to explain simple machine functions so that Mr. Craumer could speak on the same level as production supervisors and plant management he was supposed to lead.

17. On or around August of 2022, David overheard a concerning conversation involving Mr. Craumer and Mr. Davis. David heard a male voice say, "I've never met David Locklear," and heard Mr. Davis reply, "He's supposed to be some kind of fucking Indian." When David walked into the office, it was apparent, based on their body language, that the individuals knew he had overheard the comment. Mr. Craumer and Mr. Davis then informed David that Anthony Knight was being brought to the Wadesboro facility to help David with projects. Ultimately, Mr. Knight was given David's job title, Maintenance Manager, and had the same responsibilities and authority that David had when he was in the position. David was not given the opportunity to interview Mr. Knight nor was he consulted about Mr. Knight joining his team, which was highly irregular. Subsequently, David learned that Mr. Knight was involved in a discrimination investigation at the Ward facility involving a Latino employee. Mr. Knight disclosed to David that he called the Latino employee a "fucking Mexican boy" and that the employee reported the incident to the General Manager, Kenton Betx. Mr. Knight does not appear to have suffered any repercussions for this racist comment.

18. On or about October 24, 2022, David observed engineers failing to wear safety gear and violating proper "lock out tag out procedures" while working on the evaporator system. By way of background, in order for plant production equipment to be serviced they must be "locked out" to prevent any moving parts from injuring workers performing maintenance or repairs. Employees are issued physical locks to perform the lock out. In turn, there is documentation that needs to be completed memorializing that the procedure was followed. David did not have authority over the Company's engineers who flaunted the rules, so he promptly informed Mr. Craumer about the violations. Mr. Craumer told David to "back off." On a separate occasion, in or about July 2022, David complained to Mr. Craumer and Division Safety and Health Manager, Mellonie Tucker (white female), that some of his new hires were not issued locks and others did not have enough locks, but neither Mr. Craumer nor Ms. Tucker seemed to take his concerns seriously.

19. Yet, when an accident occurred at the facility on November 30, 2022, as the only Native American manager, David was scapegoated, ultimately leading to his termination. On that date, an employee fell off a screw conveyor from approximately 10 feet while working a breakdown. The accident was a direct result of the employee not following stated policies requiring that he use fall protection. This employee was issued a harness and failed to use it. David was not working when the incident occurred; Night Shift Plant Manager Brian Thomas was on duty and upon information and belief, Mr. Craumer may have also been on site. As manager on duty, Mr. Thomas was ultimately responsible for the employee following safety protocols on the night shift. Moreover, protocol required him to be physically present on every breakdown to ensure procedures were followed and a manager's lock was required to be utilized. By all accounts, Mr. Thomas either

7

was not present during the repair, which was a dereliction of duty, or he was present and failed to ensure the employee wore fall prevention gear.

20. Nevertheless, as the only American-Indian manager, David, who was home in his bed, seemingly became a focal point of the accident investigation. He was interrogated three to four times, principally by Safety Director Chris Manuel.

21. On or around December 2, 2022, Mr. Manuel informed David that he was unable to find the training sheets to prove that the injured employee received training on proper procedure for climbing to make a repair, which required the use of a manlift. It was Ms. Tucker's job to ensure training was conducted and that the necessary training sheets were completed, and she apparently did not do her job. Furthermore, it was certainly the job of Ms. Tucker's superiors and, ultimately Mr. Manuel, at the corporate level to do the same. David's Maintenance Supervisor duties were many, but doing Ms. Tucker's job was not one of them.

22. Upon information and belief, Ms. Tucker abruptly resigned shortly after the accident.

23. On December 5, 2022, an OSHA inspector was scheduled to be on site to investigate the incident. During Mr. Manuel's interrogation of David on Friday, December 2, 2022, Mr. Manuel proclaimed that he was not going to sit in front of OSHA without having somebody responsible for the accident and that he thought that person should be David. In truth, David had been a stickler for lock out safety procedures and had complained about the engineers flaunting those procedures only to be admonished by Mr. Craumer to let it go. David asked rhetorically how he, as a person who had complained about lock out safety procedures not being followed to Mr. Craumer, would be the person to be blame. David informed Mr. Craumer and Mr. Manuel that he intended to speak to the OSHA investigator on December 5th.

24. The Company never gave him the chance. At approximately, 8 AM on December 5, 2022, David was called into the office for a meeting with Mr. Craumer and Mr. Manuel. Mr. Craumer informed David he was terminated for not following lock-out tag out procedures.

25. David was not provided any specifics as to when he was alleged to have failed to follow the lock-out tag out procedures. Defendant's explanation for the termination was a pretext for discrimination. Indeed, the Facility passed a 2022 Division Safety Compliance Audit conducted by David Schaller that found no deficiencies with lock-out tag out procedures. Furthermore, David had previously confronted Mr. Craumer about engineers violating those procedures and was told to "back off," proving it was Mr. Craumer, out of his depth in the General Manager role, who was lax on safety procedures. David's fellow Maintenance Supervisor, Mr. Knight, remained employed, as did the injured white employee who caused his own accident by disregarding his training. Furthermore, another white employee, David's former General Manager at the Wadesboro Division, Chris Bivans, had multiple lock-out tag-out violations and was not only retained, but even promoted.

26. Ultimately, Defendant applied one set of rules and standards for white managers and another for its sole American-Indian manager, and when it came time to offer up a scapegoat for an injury that did not occur on David's watch, it was David who was selected as the sacrificial lamb.

27. Furthermore, the fact that Mr. Craumer and Mr. Manuel leaped to terminate David just hours before he could meet with the NCDOL OSHA inspector also evinces that his threat to tell the truth to the investigator also contributed to his abrupt termination.

28. On April 12, 2023, David filed a charge with the Equal Employment Opportunity Commission ("EEOC") and the EEOC issued its Notice of Right to Sue dated January 30, 2024.

David filed an Application and Order for Extension of Time on April 29, 2024 (within 90 days of receiving the aforementioned notice) and has timely filed this action by the deadline set forth in the Application and Order.

29. David also timely filed a charge with the North Carolina Department of Labor alleging violations of the North Carolina Retaliatory Employment Discrimination Act ("REDA"). He is awaiting the issuance of a Notice of Right to Sue ("NRTS") from that agency after which he will amend this Complaint to add a REDA claim.

30. On October 7, 2024, the NCDOL issued Plaintiff a NRTS for the aforementioned charge. Plaintiff filed this First Amended Complaint adding the REDA claim and amending the Wrongful Discharge in Violation of Public Policy claim within 90 days of receipt of the NRTS.

## VI. LEGAL CLAIMS

### COUNT ONE

*(Violations of the Civil Rights Act of 1866 / Section 1981)*

31. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

32. Plaintiff is, and at all relevant times, was a person covered by the protections of 42 U.S.C. §1981.

33. Defendant is, and at all relevant times governed by 42 U.S.C. §1981 and its prohibition on discrimination against non-white individuals.

34. Section 1981 prohibits discrimination in the terms and conditions of employment against non-white individuals.

35. Defendant engaged in unlawful employment practices by discriminating against him because of his Native American heritage by: (i) denying him the promotion to Wadesboro Facility

General Manager or the District Manager position in favor of a less experienced white employees and (ii) wrongfully terminating him.

36. As a proximate cause of the unlawful acts of the Defendant, Plaintiff has suffered lost wages, lost bonuses and other fringe benefits, diminished earning capacity, reputational damages, emotional distress, anxiety, humiliation, expenses, and other damages and is therefore entitled to recover compensatory damages and consequential damages in an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

37. Defendant's actions were done maliciously, willfully, or wantonly or in a manner that recklessly disregarded Plaintiff's rights. As a result of this outrageous conduct, Plaintiff is entitled to recover punitive damages in a sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243, treble damages and punitive damages.

## COUNT TWO

### (*Violations of Title VII of the Civil Rights Act of 1964*)

38. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

39. Plaintiff is, and at all relevant times, was an employee covered by the protections of Title VII.

40. Defendant is, and at all relevant times was, an employer as defined in 42 U.S.C. § 2000e(b) and subject to the prohibitions of Title VII.

41. Title VII prohibits discrimination in the terms and conditions of employment based on race, color and national origin.

42. Defendant engaged in unlawful employment practices by discriminating against him because of his Native American heritage by wrongfully terminating him.

43. As a proximate cause of the unlawful acts of the Defendant, Plaintiff has suffered lost wages, lost bonuses and other fringe benefits, diminished earning capacity, reputational damages, emotional distress, anxiety, humiliation, expenses, and other damages and is therefore entitled to recover compensatory damages and consequential damages in an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

44. Defendant's actions were done maliciously, willfully, or wantonly or in a manner that recklessly disregarded Plaintiff's rights. As a result of this outrageous conduct, Plaintiff is entitled to recover punitive damages in a sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243, treble damages and punitive damages.

## COUNT THREE

### (*Wrongful Discharge in Violation of Public Policy*)

45. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

46. The public policy of the State of North Carolina, as set forth in the Equal Employment Practices Act, N.C. Gen. Stat. §§ 143-422 *et seq.*, prohibits employers from discriminating against an employee because of the employee's race, color and national origin.

47. Defendant violated these public policies by terminating Plaintiff because of his race, color and/or national origin.

48. In the Occupational Safety and Health Act of North Carolina, N.C.G.S. §95-126 ("OSHA"), the State of North Carolina has declared " it a purpose and policy through the exercise of its powers to ensure so far as possible every working man and woman in the State of North Carolina safe and healthful working conditions and to preserve our human resources."

49. In REDA, the State of North Carolina has gone further to cement that public policy by making it unlawful to discriminate against an employee for "[filing] a claim or complaint, initiat[ing] any inquiry, investigation, inspection, proceeding or other action, or testif[ying] or provide[ing]information to any person with respect to" the Occupational Safety and Health Act of North Carolina ("OSHA"), N.C. Gen. Stat § 95-126 et seq. See N.C. Gen Stat. Ann. § 95-241(a).

50. Defendant violated these public policies by terminating Plaintiff for initially reporting health and safety related issues to General Manager Mike Craumer and Division Safety and Health Manager Mellonie Tucker, and just days before his termination, informing Safety Director Chris Manuel of his intent to meet with the NCDOL OSHA investigator in order to expose Defendant's ironic attempt to mislead the investigator by blaming him when it was he who had been calling out OSHA concerns to no avail before the accident.

51. As a proximate result of the Defendant's conduct, Plaintiff has suffered lost income, diminished earning capacity, future lost wages and benefits, emotional distress, anxiety, humiliation, expenses, reputational harm and consequential damages in an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

52. Defendant's actions were done maliciously, willfully or wantonly and in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result, Plaintiff is entitled to recover punitive damages from Defendant pursuant to N.C. Gen. Stat. § 1D-15 in an amount sufficient that

subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

## COUNT FOUR

### (*Violation of the Retaliatory Employment Discrimination Act*)

53. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

54. Defendant was a "person" who employed Plaintiff under the North Carolina Retaliatory Employment Discrimination Act, N.C.G.S. § 95-241 ("REDA").

55. REDA prohibits employers from taking retaliatory action against an employee if they "[f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to" the Occupational Safety and Health Act of North Carolina ("OSHA"), N.C. Gen. Stat § 95-126 et seq. See N.C. Gen Stat. Ann. § 95-241(a). Retaliatory action includes, but is not limited to: discharge, demotion, retaliatory relocation of an employee, or other adverse employment action taken against an employee in the terms, conditions, privileges, and benefits of employment.

56. Plaintiff engaged in protected activity by initially reporting health and safety related issues to General Manager Mike Craumer and Division Safety and Health Manager Mellonie Tucker, and just days before his termination, informing Safety Director Chris Manuel of his intent to meet with the NCDOL OSHA investigator in order to expose Defendant's ironic attempt to mislead the investigator by blaming him when it was he who had been calling out OSHA concerns to no avail before the accident.

57. Defendant violated REDA by taking adverse actions against Plaintiff because of his protected activity under REDA.

58. Plaintiff exhausted his remedies under REDA by filing a complaint with the North Carolina Department of Labor ("NCDOL") and filing this action within 90 days of receiving his right to sue letter from NCDOL.

59. As a proximate result of Defendant's conduct, Plaintiff has suffered damages including but not limited to: lost wages and benefits, damage to reputation, diminished earning capacity, emotional distress, humiliation, anxiety, medical expenses, consequential damages and other compensatory damages in a sum sufficient that subject matter jurisdiction is properly vested in the Superior Court divisions pursuant to N.C. Gen. Stat. § 7A-243.

60. Defendant's actions were done in bad faith and in a manner that demonstrates an unreasonable and reckless disregard for Plaintiff's rights such that treble damages are appropriate.

## **JURY TRIAL DEMANDED**

WHEREFORE, the Plaintiff prays the Court to:

1. Enter a judgment against the Defendant and order Defendant to pay Plaintiff compensatory, and consequential damages;

2. Award Plaintiff the greater of treble or punitive damages;

3. Award Plaintiff all reasonable costs and attorney's fees incurred in connection with this action;

4. Award Plaintiff such other and further equitable relief as the Court deems appropriate under the circumstances, including front pay; and

5. Grant Plaintiff a trial of this matter by a jury.

This the 31st day of October, 2024.

 _____
Joshua R. Van Kampen (NC Bar No. 32168)
Van Kampen Law, PC
315 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: (704) 247-3245
Email: josh@vankampenlaw.com
*Attorney for Plaintiff*